**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| AMERICAN OVERSIGHT, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-2423 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 21, 22 |
| | : | | |
| U.S. GENERAL SERVICES ADMINISTRATION, | : | | |
| | : | | |
| Defendant. | : | | |

**MEMORANDUM OPINION**

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**I.  INTRODUCTION**

This case concerns two Freedom of Information Act ("FOIA") requests made by Plaintiff American Oversight, a non-profit interested in government transparency.  Both requests sought records from Defendant, the U.S. General Services Administration ("GSA"), concerning plans to redevelop the headquarters of the Federal Bureau of Investigation ("FBI").  After the GSA failed to respond to the requests within the statutorily-required time period, American Oversight brought this suit.  The GSA now moves for summary judgment, arguing that it has fulfilled its obligations under FOIA.  American Oversight cross-moves for summary judgment, contending that the GSA's searches for responsive documents were inadequate, but not challenging the GSA's withholding or redacting of certain records that it did locate.  For the reasons explained below, the Court determines that the GSA's redaction and withholding of the located records are adequately justified, but agrees with American Oversight that the GSA's searches themselves were deficient.  The Court will therefore grant both motions in part and deny both in part.

## II.  BACKGROUND

On August 27, 2018, the GSA's Office of the Inspector General ("OIG") published a report called "Review of GSA's Revised Plan for the Federal Bureau of Investigation Headquarters Consolidation Project."  Compl. ¶ 7, ECF No. 1.  Among other things, the report suggested that GSA Administrator Emily Murphy may have misled Congress about the White House's involvement in an ongoing initiative to rebuild or relocate the FBI's existing headquarters.  Id.  On August 30, 2018, American Oversight filed two related FOIA requests in an effort "to inform the public as to whether and to what extent the president's personal financial interests influenced a multi-billion-dollar federal project with national security implications."  Id. ¶¶ 9–10, 15.  They were assigned tracking numbers 2018-01618 and 2018-01619.  Id. ¶¶ 14, 18.

### A.  First Request: The White House Communications Request (No. 1618)

The first request sought "[a]ll records reflecting communications . . . between or among . . . the following [GSA] individuals and any person at the White House Office (including anyone with an email address ending in @who.eop.gov) regarding the FBI headquarters consolidation project."  Lewis Decl. Ex. 1 at 2 ("White House Communications Request"), ECF No. 21-2.  It proceeded to specify various GSA officials[1] by either name, function, or position.  Id.  It also "request[ed]" that the GSA use particular search terms[2] "to help identify responsive records,"

---

[1] The GSA officials were: (a) Administrator Emily Murphy; (b) Acting Administrator Tim Horne; (c) Chief of Staff to the Administrator;  (d) "Anyone communicating on behalf of the Administrator . . . , such as a Chief of Staff, Executive Assistant, or Secretary"; (e) Public Affairs Spokeswoman Pamela Dixon; (f) Public Buildings Service Commissioner Daniel Mathews; (g) Former Acting Public Buildings Service Commissioner Michael Gelber; (h) Former Public Buildings Service Commissioner Norman Dong; and (i) Associate Administrator and Acting Chief of Staff P. Brennan Hart III.  White House Communications Request at 2.

[2] The suggested terms were: (i) "consolidat*"; (ii) "renovat*"; (iii) "demoli*"; (iv) "rebuild*"; (v) "relocat*"; (vi) "Trump Hotels", (vii) "Trump International Hotel"; (viii) TIH; (ix) "Trump Org*"; (x) "Post Office"; (xi) OPO; (xii) Headquarters; (xiii) HQ; (xiv) HQS; (xv)

2

and sought "all responsive records from January 20, 2017, through the date of search." *Id.* at 2–3.

### B. Second Request: The Trump Organization Communications Request (No. 1619)

The second request had two parts. The first part sought "[a]ll records reflecting communications . . . between or among . . . GSA officials in Column A and Trump Organization individuals or entities listed in Column B." Lewis Decl. Ex. 2 at 2 ("Trump Organization Communications Request"[3]), ECF No. 21-2. Column A listed the same set of GSA individuals listed in the first request. *Id.* Column B listed "[a]ny individuals associated with the Trump Organization LLC or Trump Hotels, including but not limited to" fifteen named individuals[4] and "[a]nyone communicating from an email address ending with @trumporg.com, @trump.com, @trumphotels.com, @ijkfamily.com." *Id.* The second part sought "[a]ll records reflecting communications . . . with the [same set of GSA] individuals . . . containing the search terms listed below." *Id.* at 2–3. The request then listed two columns of terms, specifying that "communications containing at least one search term from Column A and at least one search term from Column B are considered responsive."[5] *Id.* Both parts of the second request similarly

---

JEH; and (xvi) FBI. *Id.* at 2. The request explained that an asterisk (*) was meant to designate a "wildcard" search that would return variations on the root term. *Id.*

[3] This is the terminology used by Plaintiff in its briefing; Defendant has declined to adopt it, noting that the request did not style itself as such. *See* Def.'s Opp'n & Reply at 3 n.1, ECF No. 25. It strikes the Court as helpful shorthand.

[4] The specific individuals: (a) Donald "Don" Trump Jr.; (b) Eric Trump; (c) Ivanka Trump; (d) Jared Kushner; (e) George Sorial; (f) Amanda Miller; (g) Alan Garten; (h) Matthew Calamari; (i) Lawrence Glick; (j) Ron Lieberman; (k) Allen Weisselberg; (l) Andrew Weiss; (m) Jill Martin; (n) Deirdre Rosen; and (o) Eric "Ed" Danziger. Trump Organization Communications Request at 2.

[5] Column A listed: (i) "Trump Hotel*"; (ii) "Trump International Hotel"; (iii) TIH; (iv) "Trump Org*"; (v) "Post Office"; and (vi) OPO, while Column B listed: (i) FBI; (ii) HQ; (iii) HQS; (iv) HQs; (v) Headquarters; (vi) JEH; (vii) Hoover; (viii) consolidat*; (ix) renovat*; (x) demoli*; (xi) rebuild*; and (xii) relocat*. *Id.* at 3.

3

specified that they sought records only "from January 20, 2017, through the date of search." *Id.* at 2, 3.

### C.  Procedural History

On September 8, 2018, just over a week after the requests were submitted, the GSA acknowledged receipt and assigned them tracking numbers. Lewis Decl. ¶ 4. However, the GSA did not actually act on the requests within the statutory deadline, *see* 5 U.S.C. § 552(a)(6)(C)(i), which prompted the filing of this suit on October 23, 2018, *see* Compl. ¶¶ 19–20. The complaint alleged two violations of FOIA: one, that the GSA failed to conduct an adequate search, and two, that it was unlawfully withholding non-exempt responsive records. Compl. ¶¶ 21–33. While this litigation was pending (between December 2018 and July 2019), the GSA released responsive records in a series of productions. Lewis Decl. ¶ 21.

The GSA now moves for summary judgment, arguing that it has now adequately searched for records responsive to the requests, properly withheld and redacted some responsive records pursuant to some of FOIA's various exemptions, and released all non-exempt, reasonably segregable information. Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s MSJ") at 1, ECF No. 21-1. American Oversight disagrees, arguing that (1) the GSA's search in response to the Trump Organization Communications Request was inappropriately limited because the agency wrongly construed the request, and (2) neither of GSA's searches were adequately geared to capture non-email communications. Pl.'s Mem. of P. & A. in Supp. of Pl.'s Cross-Mot. for Summ. J. & in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s XMSJ") at 4, ECF No. 22-1. American Oversight does not challenge the GSA's invocation of FOIA exemptions or otherwise object to the GSA's summary judgment motion.

### III.  LEGAL STANDARD

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  Summary judgment is justified when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if there is enough evidence for a reasonable finder of fact to decide in favor of the non-movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007), while a "material" fact is one capable of affecting the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When presented with a motion for summary judgment in the FOIA context, the district court must conduct a *de novo* review of the record.  *See Multi Ag Media LLC v. U.S. Dep't of Agriculture*, 515 F.3d 1224, 1227 (D.C. Cir. 2008).  The burden is on the agency to justify its response to the plaintiff's request.  *See* 5 U.S.C. § 552(a)(4)(B).  "An agency may sustain its burden by means of affidavits, but only if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Multi Ag Media*, 515 F.3d at 1227 (citation omitted).

When the adequacy of a search is at issue, the agency "must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Reporters Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).  "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).  "The

adequacy of the search, in turn, is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case." *Id.* If "the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

## IV.  ANALYSIS

The Court will follow American Oversight's lead and focus on the specific objections to the adequacy of GSA's searches, rather than on other aspects of GSA's search or invocation of exemptions as to the located documents.[6]

### A.  The Trump Organization Communications Request

#### 1.  Implied Subject Matter Limitation

As its supporting declaration explains, the GSA "interpreted" the Trump Organization Communications Request as "seeking records reflecting communications pertaining to the FBI

---

[6] Even when the adequacy of a search, use of a particular exemption, or the segregability requirement is not challenged, "the Court still has an independent duty to 'determine for itself whether the record and any undisputed material facts justify granting summary judgment.'" *Tokar v. U.S. Dep't of Justice*, 304 F. Supp. 3d 81, 94 n.3 (D.D.C. 2018) (quoting *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016)). Here, beyond the specific objections lodged by American Oversight, the Court agrees with Defendant that the steps outlined in the Lewis Declaration otherwise represent "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'" *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). Additionally, the Lewis Declaration and the accompanying Vaughn Index, Lewis Decl. Ex. 10, ECF No. 21-2, "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)). And finally, based on the Lewis Declaration, the Court is satisfied that Defendant has met the segregability requirement. *See Milton v. U.S. Dep't of Justice*, 842 F. Supp. 2d 257, 260 (D.D.C. 2012) ("An affidavit stating that an agency official conducted a review of each document and how she determined that no document contains segregable information fulfills the agency's obligation.").

headquarters consolidation project." Lewis Decl. ¶ 11. Based on this interpretation, the GSA selected a set of search terms designed to locate material relevant to that topic. Def.'s MSJ at 10–11. American Oversight argues that GSA, in interpreting the request in this fashion, inferred a nonexistent subject matter limitation and thereby unreasonably narrowed the scope of the request.

The Court agrees with Plaintiff. Neither part of the Trump Organization Communications Request contained a subject matter restriction. Rather, as explained above, the first part of the request sought all records of communications between or among a set of GSA officials and Trump Organization officials, regardless of subject matter, while the second sought all records of communications with a set of GSA officials containing specific key terms. *See* Section II.B, *supra*. Neither part limited itself to a particular topic or subject area. Resisting this conclusion, the GSA urges that the request should be "considered as a whole," and points to the opening paragraphs of the request (which discuss American Oversight's reasons for making the request) and the suggested search terms in the second part of the request (which include related terms like "FBI," "Trump Org*" and "Trump Hotel"). Def.'s Mem. in Opp'n to Pl.'s Cross-Mot. ("Def.'s Opp'n") at 4–5, ECF No. 25. But it is not the agency's role to intuit the "purpose" of a request and impose a corresponding limitation on the associated search. *Cf. Charles v. Office of Armed Forces Med. Exam'r*, 730 F. Supp. 2d 205, 215 (D.D.C. 2010) ("To allow an agency to restrict the number of documents it deems responsive . . . based on its interpretation of the plaintiff's purpose in making the request constitutes an unreasonable limitation . . . ."). Rather, "'the agency is bound to read the request as drafted, not as agency officials might wish it was drafted,' and it may not narrow the scope of a FOIA request to exclude materials reasonably within the description provided by the requester." *Urban Air Initiative, Inc. v. Envtl. Prot.*

7

*Agency*, 271 F. Supp. 3d 241, 255–56 (D.D.C. 2017) (quoting *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984) (alterations omitted)).  The operative language of each part of American Oversight's request is clearly labeled and unambiguous and, moreover, does not import or cross-reference any of the prefatory material from the opening paragraphs.[7]  Thus, while it is true that an agency may "construe the request as it reasonably sees fit" when faced with a "vague and poorly worded request," such interpretive efforts were not necessary here.  *Hamilton Sec. Grp. Inc. v. Dep't of Hous. & Urban Dev.*, 106 F. Supp. 2d 23, 33 (D.D.C. 2000), *aff'd*, 2001 WL 238162 (D.C. Cir. Feb. 23, 2001).  In short, the agency erred in construing the request as only relating to seeking records pertaining to the FBI headquarters consolidation project.  *See Utahamerican Energy, Inc. v. Mine Safety & Health Admin.*, 725 F. Supp. 2d 78, 83, 82 (D.D.C. 2010) (explaining that an agency's search is not "reasonably calculated to produce all documents responsive to . . . [a FOIA] request" where the search "contain[s] subject matter and time restrictions that were absent in . . . [the] request").[8]

### 2. Use of Narrower Subset of Terms

As to the second part of the request, the GSA declined to use the full suite of search terms specifically set forth in the request.  Lewis Decl. ¶ 14.  As the supporting declaration explains, GSA determined that some of the proposed terms "were so general and common that using each

---

[7] American Oversight plausibly maintains that this background motivational material was included in order to justify its requests for fee waivers.  Pl.'s XMSJ at 12; *see also* 5 U.S.C. § 552(a)(4)(A)(iii) (requiring that documents be furnished without charge when disclosure is "in the public interest").

[8] Judge Friedrich recently reached the same conclusion in a related suit brought by American Oversight against the Office of Management & Budget (OMB) regarding a similarly-structured FOIA request.  *See Am. Oversight v. Office of Mgmt. & Budget*, No. 18-cv-2424, 2020 WL 1536186, at *5 (D.D.C. Mar. 31, 2020) ("OMB's search for records responsive to the second request . . . was inadequate because it imposed a subject matter limitation that was not present in either part of American Oversight's second request.").

term alone, as requested by Plaintiff, would capture many records unrelated to the FBI headquarters consolidation project and would cause significant delays in conducting searches and reviewing records for responsiveness." *Id.* ¶ 16. American Oversight argues that, in doing this, the GSA ignored the clear language of the request and instead "conduct[ed] a search for records containing narrow combinations of multiple terms of GSA's own choosing." Pl.'s XMSJ at 16.

Two initial points are worth clarifying. First, the GSA's approach here reflects the same flaw discussed above: it unjustifiably construes the request as seeking only communications relating to the FBI headquarters consolidation project. Second, it seems to misunderstand the basic structure of American Oversight's request. The second part of the request did not ask the GSA to use "each term alone," Lewis Decl. ¶ 16; rather, in an apparent effort to restrict the range of responsive material, the request limited itself to documents containing at least one term from *each* of two sets of terms, *see* Trump Organization Communications Request at 3 (specifying that "communications containing at least one search term from Column A and at least one search term from Column B are considered responsive"). This misreading undercuts the GSA's claim that executing American Oversight's request as written would cause "significant delays in conducting searches and reviewing records for responsiveness." Lewis Decl. ¶ 16. Taken together, these two considerations alone make the GSA's search in response to the second part of the request unreasonable.

More broadly, American Oversight denies that the GSA had the discretion to use a more limited set of search terms with respect to this part of the request. It acknowledges that, in general, an agency "is not required to employ search terms suggested by a FOIA requester." Pl.'s XMSJ at 16. But American Oversight insists that in this context, "[t]he listed terms are not

9

suggested search terms"—instead, "they define which records are responsive." *Id.* In other words, American Oversight did not include a proposed set of search terms that it thought would produce documents relevant to a particular topic; rather, it defined relevancy itself as a function of a limited set of specific terms. The GSA, predictably, finds this argument too clever by half. *See* Def.'s Opp'n at 10 (arguing that, regardless of Plaintiff's characterization, "these terms function as suggested search terms or instructions" and that "an agency selecting search terms is entitled to reject the requester's suggested or proposed terms as overly broad or otherwise unsuitable").

It is true that, "[i]n general, a FOIA petitioner cannot dictate the search terms for his or her FOIA request." *Bigwood v. U.S. Dep't of Def.*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015) (citing *Physicians for Human Rights v. U.S. Dep't of Def.*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009)). And normally, a federal agency has "discretion in crafting a list of search terms that 'they believe[] to be reasonably tailored to uncover documents responsive to the FOIA request.'" *Agility Pub. Warehousing Co. K.S.C. v. Nat'l Sec. Agency*, 113 F. Supp. 3d 313, 339 (D.D.C. 2015) (quoting *Physicians for Human Rights*, 675 F. Supp. 2d at 164); *see also Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (observing that "FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the courts should attempt to micro manage the executive branch"). But here, the GSA did not use its discretion to develop a set of search terms that, in the agency's considered judgment, would produce results relevant to a particular topic or issue. *Cf. Bigwood*, 132 F. Supp. 3d at 132–33, 141 (finding that the agency crafted a reasonable set of search terms when requests sought all records relating to Honduran Army General Romeo Vásquez Velásquez and the coup against Honduras' President Manuel Zelaya); *Liberation*

10

*Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 141, 146 (D.D.C. 2015) (finding that agency "crafted a list of search terms reasonably designed to lead to the information requested"—specifically, contracts regarding payments to certain journalists). Here, as already explained, there is no particular topic or issue articulated by the request, at least beyond the one later divined by the GSA. In essence, the GSA first imposed its own subject matter limitation on the request, and then developed its own set of search terms that it thought was tailored to this imagined request. This two-step procedure was unnecessary. Rather, when presented with American Oversight's request that "reasonably describe[s]" the records sought with sufficient particularity, 5 U.S.C. § 552(a)(3)(A), the GSA was required to make "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested," *Reporters Comm. for Freedom of Press*, 877 F.3d at 402 (quoting *Oglesby*, 920 F.2d at 68). That said, when faced with a request like the one at issue here (that is, one where relevancy is defined by a particular set of terms), an agency is not necessarily required to blindly execute the corresponding search. For instance, depending on the scope of a search and the records implicated, a search may pose an undue burden.[9] *See Ayuda, Inc. v. Fed. Trade Comm'n*, 70 F. Supp. 3d 247, 275 (D.D.C. 2014) (recognizing that an agency "is not required to comply with a request that is 'so broad as to impose an unreasonable burden upon the agency'") (quoting *Am. Fed'n of Gov't Emps., Local 2782 v. U.S. Dep't of Commerce*, 907 F.2d 203, 209 (D.C. Cir. 1990)). Or a request may contain so many search terms requiring so many combinations that the search is technically not feasible. But in the absence of a more

---

[9] In the context of electronic word searches, it is of no assistance to the Court for a party to claim a burden based on a claim that a particular search term would result in the retrieval of too many irrelevant records without making any attempt to quantify that burden.

11

specific objection or a showing of burden or infeasibility, the agency cannot narrow or redefine the substance of the request and then craft a corresponding set of search terms.

## B. Non-Email Communications

Both of American Oversight's requests specifically sought "[a]ll records reflecting communications," including those contained in "email attachments, text messages, voicemails, voicemail transcripts, messages on messaging platforms . . . , telephone call logs, calendar invitations, calendar entries, meeting notices, meeting agendas," and various other kinds of formats and media.  White House Communications Request at 2; *see also* Trump Organization Communications Request at 2–3 (same).  However, the GSA initially determined that "any responsive records would likely be in the form of emails" and therefore searched only the GSA's email archives.  Lewis Decl. ¶ 17.  When Plaintiff inquired into the existence of any "non-email records responsive to the FOIA requests," the GSA "then located additional responsive records in the form of calendar entries."  *Id.* ¶ 18.  Relevant custodians also searched their personal workspaces for paper records.  *Id.*  In a supplemental declaration, the GSA explains that it has made additional searches "of electronic work folders (i.e., centrally archived copies of the document directories personally maintained by GSA employees on their government-issued computers) and shared network drives accessible by [the relevant] custodian."  Second Lewis Decl. ¶ 3, ECF No. 25-1.  It also explains that "for the time period involved, GSA did not provide the custodians with text messaging capability or access to any instant or group messaging systems."  *Id.* ¶ 4.

Plaintiff argues that these efforts are insufficient, and the Court again agrees.  While "the government is not required to search everywhere a document *might* be," and instead "is only required to search those places where a document is *likely* to be," *Judicial Watch, Inc. v. U.S.*

*Dep't of Hous. & Urban Dev.*, 20 F. Supp. 3d 247, 254 (D.D.C. 2014), it still must "provide adequate justification in its . . . declaration for limiting its searches to . . . particular categories of records." *Am. Oversight v. Office of Mgmt. & Budget*, No. 18-cv-2424, 2020 WL 1536186, at *6 (D.D.C. Mar. 31, 2020); *see also Sea Shepherd Conservation Soc'y v. IRS*, 208 F. Supp. 3d 58, 69 (D.D.C. 2016) (noting that the agency's declaration "must at least include the agency's 'rationale for searching certain locations and not others'") (quoting *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 92 (D.D.C. 2009)). Here, the GSA does not even mention why it did not attempt to search voicemails or call logs, two formats specifically highlighted in American Oversight's request. Additionally, that the GSA did not "provide" the relevant employees with text messaging capability or access to messaging systems is not, standing alone, reason to conclude that no relevant agency communications existed in those formats. Indeed, the GSA does not explicitly spell out why this fact—that the agency did not itself provide the capability—is legally significant.[10] Taken in its best light, the GSA's position appears to be that because it does not provide the relevant capabilities on its employees' official devices, any texts or instant messages would be stored on custodians' personal devices—and the GSA is not required to search those, at least (perhaps) in the absence of some evidence that employees used their own devices for official business. *See Competitive Enter. Inst. v. Nat'l Aeronautics & Space Admin.*, 989 F. Supp. 2d 74, 94 (D.D.C. 2013) (rejecting argument that agency "should have searched personal electronic devices for responsive emails" when plaintiff "fail[ed] to

---

[10] The relevant question would appear to be whether official agency business was *in fact* ever conducted via text message or instant messaging, not whether it was conducted on privately or officially provided devices or systems. *Cf. Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 150 (D.C. Cir. 2016) ("If a department head can deprive the citizens of their right to know what his department is up to by the simple expedient of maintaining his departmental emails on an account in another domain, [FOIA's] purpose is hardly served.").

13

support this with any evidence in the record that [the custodian] used a personal electronic device for agency work"). But the GSA does not actually make this argument. *See Landmark Legal Found. v. U.S. Envtl. Prot. Agency*, 959 F. Supp. 2d 175, 182 (D.D.C. 2013) (concluding an agency's "failure to deny the allegations that personal accounts were being used to conduct official business leaves open the possibility that they were").

Ultimately, in the absence of a clearer explanation of why these kinds of records are not "likely to contain responsive materials," *Oglesby*, 920 F.2d at 68, the GSA "must either conduct a search of these communications, or if it is unable to do so, explain how it is not feasible to search these messages for responsive material." *Ctr. for Biological Diversity v. U.S. Envtl. Prot. Agency*, 279 F. Supp. 3d 121, 143 (D.D.C. 2017); *see also DeBrew v. Atwood*, 792 F.3d 118, 123 (D.C. Cir. 2015) (noting that an agency "is not obligated, nor is it able, to disclose a record it does not have").[11]

## V. CONCLUSION

For the foregoing reasons, both parties' motions for summary judgment will be granted in part and denied in part. Specifically, summary judgment is entered on behalf of the GSA with respect to the withholdings and redactions of the records located to date, and with respect to the adequacy of the searches insofar as they were not challenged by American Oversight. However, the GSA must nonetheless conduct an additional round of searches consistent with this Opinion.

---

[11] Plaintiff also questions why the six calendar entries produced by the GSA were considered responsive, and suggests this indicates an inadequate search. *See* Pl.'s Reply at 16, ECF No. 27 ("The records on their face are not responsive to GSA's search terms, indicating that, at a minimum, there is further information included within or attached to the full versions of the released calendar entries that GSA has not released . . . ."). Given that the GSA will be required to conduct new searches consistent with this Opinion, the Court declines to find the search inadequate on this separate ground. But the GSA should be aware of its obligation to "adequately describe [its] search." *Oglesby*, 920 F.2d at 68.

The parties will then be permitted to raise and brief any issues concerning the adequacy of the new search and/or the withholding and redaction of information from any new records located as a result of that new search.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 28, 2020                                              RUDOLPH CONTRERAS
                                                                       United States District Judge